Good morning. Good morning. Please support Robert Scott on behalf of Linda Feldman. If I could, let me reserve two minutes of my allotted time. Sure. Your time. Your Honors, in this case we face yet again the issues that have been before this Court a number of times and before our appellate courts. And I wanted to start with just sort of a review very briefly to bring us up to and pay a couple of attention to a couple of new cases that have since come to the horizon. From all the way back to Cominelli in 1958, our California courts, Fletcher in 70, Gruenberg in 73, Neal 78, Egan 79, Witkin, the authors of our reviews, have all held without question that the bad faith court allows and looks at unreasonable conduct. And that should be a question of fact. This Court in Caldera, in Amadero, and in Hancock has considered those exact same questions. You know, counsel, in reading this record, what struck me was that Metropolitan Life had made considerable effort to get a hold of treating doctors who simply wouldn't respond. Your Honor, that's true. But the only medium used to, with this considerable effort, was a telephone. They did not mail one letter. They had an authorization, a signed authorization, which was required. And that signed authorization would allow for the gathering of medical records. Medical records traditionally are not gathered over the phone because you can't get the complexity, especially if the company is going to review them by their own physicians or skilled personnel. None of that happened here. The only thing that happened was a telephone. That sorrowfully fails the criteria of adequate investigation, or at least under this record presents a triable issue of fact as to that. And if I could note, the other things that weren't investigated that they had in the file, this person had been awarded social security disability, a standard much higher than the standard here under applicable law. She had also been awarded state disability previously, never investigated. She did not have they'd never got a medical record to look at other than what she said. And in the context of what she told them and sent them, all of the medical evidence in writing submitted by her on their forms found her to be disabled in the relevant time when they denied the claim. They ignored all of that. And most importantly, they continued to misuse the criteria of our California Supreme Court in stating what the standard, Erica and Noor, what the standard of disability should be, and they misstated it in the context of the denial letter and of the application. So to suggest that all of that evidence against phone calls presents in today's world an adequate investigation of the medical status of someone who has a disability is far from the standard of care. And for how many months was this period when they deprived her of benefits? For how many months? How many months? When they were doing the review? Yeah. For what period of time did they not pay benefits? Yes. The claim was made, just for our purposes, the claim was made in November of 04. The denial came in August of 05. During that time, there was a six-month elimination period, and that six months ran from 11-19-04 to 5-19-05. However, the company found her to be disabled during that six months of elimination period when no benefits were due and paid one month from May to June 05. And after that, paid no more. The next month, they filed the denial letter. So they found her essentially disabled for the seven months, but only one was paid. When they changed their mind, they then retroactively paid to when? They retroactively paid back to the beginning. But, Your Honor, I would note to you that they only changed their mind when they had the benefit of local counsel. They hired a very prestigious firm of one of the Richard Barkers, which is one of the former insurance commissioners of this state, and I'm sure at a reasonable hourly rate, and used that expertise to do the exact investigation, to subpoena, and in this case using authorization, to gather records, to review records that should have been done and applied the correct standard that was never done underneath in this case. So she was retroactively, they went back and paid all the way. Is that right? They did. Okay. What was the interval of time that she went without benefits? 17 months. 17 months. And in this context, during that time, she suffered, she essentially had to go on, just as in the Amedeo case, the court lists that disability benefits are some of the most important to be paid on a prompt basis. In effect, payroll protection. And during the payroll time when you're not working and you're disabled, the regular person that seeks these benefits that's the regular working person out there can't survive two or three months, let alone almost a year and a half in the context. It is exactly that reason that we require them to do a reasonable and prompt investigation of these claims and pay when liability is reasonably clear under our California applicable standard and regulation. But they cannot do so unreasonably. And we look not at what they ultimately did once they had the benefit of counsel in our lawsuit, which was filed and brought to their attention through the legal department. That's the purpose of management and training at the ground level of these cases because of the importance, and I would remind the court, as absolutely pointed out in the Amedeo case, these are quasi-public trusts that insurance, that we as a society allow insurance companies to do because of the inherent inability of strength of bargaining power by the insured. She had no way to compel them to do a thorough investigation. If they're going to offer this benefit to California citizens, they have to know what the extrinsic law is. My Lord, the disability benefit law goes back to the 40s in America and reaffirmed in a number of cases in our California court and in the Ninth Circle. We've all recognized this. For the company to employ someone and not supervise and train and ensure that that minimum standard is met raises very significant issues of tribal fact, and we suggest that all of those issues should be brought here. And I noted to you a couple, but in the context, I want to just bring out two other cases. We briefed the Wilson case to you, which is our Supreme Court's most recent decision, holding again if we allege unreasonable investigation and claims handling, that that alone allows us to go to a jury if there's open questions of fact. But there's been two other cases that have become final since our briefing schedule, and I'll send you that letter with those two just to give you the names. They're coming. I'll get to them in a few days. The first one is Breen, B-R-E-H-M, which is an August 2009 decision by the appellate court, and McCoy, February of this year, which embraced the CACI, the newest jury instruction in California, the CACI instruction on duty to investigate in bad faith, and it restates the exact body of law that I have urged on you today and is an unbroken chain of decisional law, again, since the 50s. That McCoy case said in a trial setting, no, that is the appropriate jury instruction. In the Breen case, it said you cannot get out by way of summary judgment if you raise the question of the other triable facts because of the duty to reasonably investigate the claim, as did our Supreme Court in Wilson. It appears, frankly, Your Honors, that there are a number of judicial officers below that have yet to get the word on this appellate review that reaffirms the criteria. If you would, the reasonable belief or the genuine issue and the genuine dispute had muddied those waters for a few years, being someone who's practiced exclusively in that field for more than 25. I've seen the pendulum swing back and forth. We are back to what our law has always been. That needs to be enforced. Mrs. Feldman is entitled to her jury trial. I'll reserve the rest of my time unless I have a question. No, that's fine. Thank you. I'll take the phone. I'll call the phone.      I'm going to call the phone. Okay. Thank you. Okay. Thank you. Thank you. Good morning. Please accord royal oaks for defendant and appellee of Metropolitan Life Insurance Company. You got a nice compliment from your opponent. Yes. I appreciate that. Mr. Scott is always very generous, and we try to reciprocate. Your Honors, I think the most important reason to affirm the decision of the trial court in this case is that when you take a look at the fact patterns of the cases that have found the genuine dispute doctrine should apply, and you take a look at the fact patterns of the cases where the courts have said genuine dispute, we don't see the facts of this case dramatically are closer to the cases where the genuine dispute doctrine is upheld. And I think that some of the questions that the judges have posed have focused on some very important issues. Metropolitan Life did make a considerable effort to get as much information as possible about this claim. What about not writing letters? First of all, Your Honor, we have looked in the insurance code, and we have looked in the cases, and we have looked in the insurance regulations promulgated by the commissioner, the claims manual, and the policy. There is no requirement anywhere that you have to write to the doctors. It's important that you get relevant information. But nobody suggests that you have to do it in writing. In fact, there is much authority, and our expert indicated in his sworn declaration, that a lot of times it's better to get the doctors on the phone because when you write a letter, the doctors just ignore it. They set it aside. But when either you or the patient slash policyholder call up the doctor and say, we'd like your records or we'd like to know the reason why she can't return to work, that's more helpful. So that's the first point, is that there is no requirement that actually someone go do it in writing. The second point I'd make on that, Judge Fisher, is that we tried specifically many times, both with the reflex sympathetic dystrophy doctor, Dr. Ding, and the psychiatrist, Dr. Summerar, asking them for their records, asking them why Ms. Feldman cannot return to work. And I believe that the record is very clear, and I apologize for taking up nearly 14,000 words, but these cases are so fact-intensive, there were hundreds of steps trying to gather the information. Dr. Ding, the pain doctor, basically stonewalled the company repeatedly until finally we got him on the phone in August 2005, and he said, here's the deal. Yes, I certified her as disabled back in April. She had RSD. However, the diagnosis has changed. I did a neurodiagnostic test in July. She doesn't have RSD anymore. She does have pain, but the bottom line is, I can't certify her as disabled anymore. I think she can return to work. There were no doctors saying that she was disabled. She specifically said to the company, don't go to that Dr. Summerar. Don't go to anybody else. Go to Dr. Ding. He's my pain doctor. He's certifying me as disabled. So they got the equivalent of his records going to the horse's mouth. I've seen so many cases where people rail at the insurance company, sometimes justifiably, for saying, you didn't go to her doctor. You just acted on the cold record. Well, they went to the horse's mouth. The second point about records, Your Honor, is a very important one. And in this sense, I can't quite understand Plaintiff's theory. When she filed for disability, she said, I got two things. I got pain and depression. Her doctor filed the attending physician's statement, two things, pain and depression. They went after the pain doctor with Dr. Ding, finally got him, her own doctor,  The other half was a mystery. For six or seven occasions in July and June of 2005, MetLife went to the Dr. Summerar, the psychiatrist, saying, please tell us what's the reason she can't return to work. Six calls were ignored. Finally, the doctor's assistant says, look, send us a questionnaire. Fax it to us. They faxed them, as you know from the record, that day. He ignored it, and a month later his office said, well, we don't know when we're ever going to get around to it. We now know, Your Honors, why this was impossible for MetLife to get records pertaining to the psychiatric condition, half of her claim, quoting briefly from her deposition. Do you remember talking to Dr. Summerar about the question of whether he would send any information to MetLife about his treatment with you? Yes. And what was the gist of the conversation, Ms. Feldman? I felt uncomfortable with the information going to MetLife. We spoke about the fact that once the toothpaste is out of the tube, you can't put it back in. Question, so you really didn't want your psychiatric records to be given to MetLife because of a concern that they might get into the hands of others, right? Answer, that was my concern, that they would be sitting in a conference room, there would be a meeting with people, and when you're in a medical situation and talking about sensitive documents, the CFO would learn about it and so on. Your Honors, this was a stonewall situation. So we denied the claim. And to clarify the timing, from day one, she was eligible for money. We paid her. We started paying her. A month later, we suspended it. Why? Because Dr. Ding said, she's not under treatment. I haven't seen her for three months. She didn't have a diagnostic procedure that was scheduled. So they suspended her briefly. Then for the next two months, June and July, all this investigation, 30 phone calls, faxes, letters and so on to the doctors, and they get the Dr. Ding opinion in August of 2005. Acting on that, they say, we deny the claim. We're sorry, but if you have more information, submit it to us. Well, she wasn't about to submit the Dr. Summerauer information because, as we know from her depo, she wanted to hide that. Instead of submitting more information, she sued. My office sent out subpoenas. Now, contrary to what counsel suggested, it wasn't a law firm that then took over. I subpoenaed the records, but now Dr. Summerauer couldn't do the cover-up any longer. He had to produce his documents. They went not to Barger and Rowland, but to the claims adjusters. The claims adjuster gave it to a psychiatrist, and he said, wow, she's disabled from a psychiatric standpoint. So MetLife, in October of 2006, said, yes, you're disabled. We pay you all the way back to June. So she was paid all the way current to October of 2006. And they said, Ms. Feldman, you get two years of mental and nervous psychiatric disability, so we'll pay you for the two years, and then we'll see about physical. So they paid her for the two years into 2007. And, of course, the evidence is that Ms. Feldman knew that if it was a psychiatric disability, she'd only get two years' benefits. If it was physical, on the other hand, she would get it for decades. So now we fast-forward to the end of the two years of the psychiatric in 2007. We say to her, we could cut you off right now. The company says, but, you know, we're going to investigate the physical, and so they keep paying her. They get her records, they go to a doctor, and the doctor says, yes, now I believe she is physically disabled, and we've paid her ever since. So it has been quite a saga of a situation where they have chased the case, finally got the opinion, they paid, they investigated thoroughly. What's the bottom line of all this, Your Honors? I think the bottom line is that, if I could go back to my initial point, the case law in the line of cases showing, talking about, denying genuine dispute is dramatically different from this case. Let me give you a couple of examples. Counsel mentioned the Amadeo case and also the Wilson case. Amadeo is my favorite. Amadeo case, this lady was working hard in the securities industry for 20 years, but she succumbs to depression so badly she has to just quit her job for a while, she's so depressed. So then she files her disability claim. What does the brilliant insurance adjuster do? He looks at the claim and he says, huh, according to the policy, your occupation under this policy is the last occupation you had before you filed your claim. You were unemployed just before you filed your claim. Exactly. And so, of course that's bad faith. No one would invoke the genuine dispute doctrine there. Other case that counsel talks about is the recent Wilson case, which certainly upholds the continued viability of the genuine dispute doctrine, but the reason there was bad faith there was, once again, astounding conduct by the insurance adjuster. Your Honors may remember, this lady was in Australia claiming horrible pain, and they denied her claim because the adjuster said, gosh, she's on vacation in Australia, how bad can it be? No genuine dispute doctrine there. Evidence of bad faith there. Given that evidence, of course there are some cases where you're going to find no genuine dispute, but yes to bad faith, but that's got nothing to do with this case. This case is so much closer to the cases that have found genuine dispute, and I'll just mention two quickly. One is the Chateau Shamboree case. In the Chateau Shamboree case, you had a situation where the court said, you know, if it's mere sloppy or negligent claims handling, it is simply not enough to rise to the level of bad faith. Chateau Shamboree had an interesting point. There was an allegation there that the insurance company failed to obtain all necessary reports, engineering, inspection reports, and so on. Sounds a little similar to this case, where it's claimed, well, you didn't get everything that you were supposed to get in paper, you didn't ask for it in writing. Bottom line, Your Honors, is, with all due respect to plaintiff's theory, they're trying to micromanage the claim process. They're trying to say there's just one way to do a claim. You've got to have an IME, and you've got to do this in writing, and you've got to do that in writing. And that's not supported by the insurance code. It's not supported by the case law or the insurance regulations promulgated by the Department of Insurance. The bottom line is, Your Honor, the trial court had all this information, the voluminous factual record before it, and its final decision determined that this case simply does not rise to the level of bad faith. Instead, a genuine dispute truly did exist. Thanks very much. Thank you. Very briefly in rebuttal, my distinguished and animated co-painter seeks to, I would say, obfuscate what the reality of the case law is. I would like to conclude that the insurer acted unreasonably. That's our Supreme Court in Wilson citing to this Court in Amadeo. Specifically, how many of us would buy insurance if the company said, now, if you make a claim, we're only going to make phone calls. We're going to ask you to send in your attending physician statement, but we're only going to make phone calls. We're not going to do any other investigation. Do you think actually anybody would buy that product? And in the context of today's world, how many times are we able to get our physician on the phone, even if it's us with a medical problem, let alone an adjuster? And the record's very clear. In the calls to the adjuster, the question to the doctor was, what barriers are there that prevent this person from returning to work? That was the exact quote. Now, as a physician in a busy world of today in managed care, and a phone call comes in, relayed through the nurse, what barriers are there? That's not even the test. So the phone calls don't work. You can't go there. And to have to suggest here that we're Dr. Ding, Stonewall, or anybody else, using words only to dissent. Counsel, you're over time. Thank you. But I think you have the essence of the argument. Yes. Let me just add this one sentence, Your Honor, and that is, when they did pay, they did it based on written documents in their file, the attending physician statement. So that should be the same standard imposed on them. Thank you very much. Okay. All right. Thank you, Counsel. We appreciate the argument. And we'll stand in a brief recess, about ten minutes, and then finish the calendar.  All rise. All rise. All rise. All rise.
judges: Fletcher B. , Fisher, Gould